HOUSING PIONEERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Housing Pioneers v. Commissioner
Docket No. 9018-91X
United States Tax Court
T.C. Memo 1993-120; 1993 Tax Ct. Memo LEXIS 118; 65 T.C.M. (CCH) 2191; March 29, 1993, Filed *118 P is a California nonprofit corporation. Its stated purpose is to provide innovative and affordable housing for low income people, handicapped persons, and pre-and post-incarcerated persons. P intends to act as a co-general partner in for-profit limited partnerships which own residentially developed real estate which is to be used as low income housing and which will qualify for the general business credit under I.R.C. secs. 42 and 38. By P's acting as co-general partner, the limited partnerships expect to become entitled to a State property tax reduction under sec. 214(g) of the California Revenue and Taxation Code (West 1987). P's share of the funds from the property tax reduction are to be used by P to finance activities designed to accomplish certain charitable purposes. Held: P's activities performed as co-general partner in for-profit limited partnerships substantially further nonexempt purposes, and private interests will be served by its activities. Consequently, P fails the operational and private inurement tests contained in I.R.C. sec. 501(c)(3), and as a result P does not qualify for tax-exempt status under I.R.C. sec. 501(a). For petitioner: Gary T. Moyer. *119 For respondent: Charles B. Burnett. NIMS
NIMS
MEMORANDUM OPINION NIMS, Judge: The Commissioner determined that petitioner does not qualify for exemption from Federal Income Tax under section 501(a) as an organization described in section 501(c)(3). (Unless otherwise indicated, all section references are to the Internal Revenue Code in effect when the petition was filed. All Rule references are to the Tax Court Rules of Practice and Procedure.) Petitioner challenges respondent's determination by invoking the jurisdiction of this Court for a declaratory judgment pursuant to section 7428. The issues for our decision are whether petitioner is operated exclusively for charitable purposes and whether any of its net earnings inure to the benefit of private individuals. This proceeding was submitted under Rule 122. The administrative record is assumed genuine for purposes of this proceeding. Rule 217(b). By means of exhibits attached to its reply brief petitioner has attempted to supplement the administrative record for just cause under Rule 217(a), alleging that respondent's opening brief asserts five new issues. Respondent has filed a motion to strike on the ground that the materials *120 submitted were not part of the stipulated administrative record and their inclusion would place respondent at a disadvantage. Since the materials in question do not in any event aid petitioner's cause, respondent's motion is deemed moot and will therefore be denied. Petitioner Housing Pioneers, Inc., is a California nonprofit corporation and its principal office was located in San Diego, California, when it filed its petition. Petitioner's exempt purpose, as defined in its articles of incorporation, is to provide low income and handicapped persons as well as previously incarcerated individuals with innovative and affordable housing. Petitioner devised a unique method to accomplish this exempt purpose, which, if successful, would allow it to take advantage of a State property tax exemption. Section 214(g) of the California Revenue and Taxation Code (West 1987) ("Californiasection 214(g)"), as relied upon by petitioner, permitted a partial property tax reduction for property owners of rental housing where the property, the owner, and the tenants meet certain criteria. [1]Section 214(g) provides: (g) Property used exclusively for rental housing and related facilities and owned *121 and operated by religious, hospital, scientific, or charitable funds, foundations, or corporations, including limited partnerships in which the managing general partner is an eligible nonprofit corporation, meeting all of the requirements of this section shall be deemed to be within the exemption provided for in subdivision (b) of Section 4 and Section 5 of Article XIII of the California Constitution and this section and shall be entitled to a partial exemption equal to that percentage of the value of the property which the portion of the property serving lower income households is of the total property in any year in which any of the following criteria are applicable: (1) Twenty percent or more of the occupants of the property are lower income households whose rent does not exceed that prescribed by Section 50053 of the Health and Safety Code. (2) The acquisition, rehabilitation, development, or operation of the property, or any combination of these factors, is financed with tax-exempt mortgage revenue bonds or general obligation bonds, or is financed by local, state, or federal loans or grants and the rents of the occupants who are lower income households do not exceed those *122 prescribed by deed restrictions or regulatory agreements pursuant to the terms of the financing or financial assistance. (3) The owner of the property is eligible for and receives low-income housing tax credits pursuant to Section 42 of the Internal Revenue Code of 1986, as added by Public Law 99-514. In order to be eligible for the exemption provided by this subdivision, the owner of the property shall do both of the following: (A) Certify and ensure that there is a deed restriction, agreement, or other legal document which restricts the project's usage and which provides that the units designated for use by lower income households are continuously available to or occupied by lower income households at rents that do not exceed those prescribed by Section 50053 of the Health and Safety Code, or, to the extent that the terms of federal, state, or local financing or financial assistance conflicts with Section 50053, rents do not exceed those prescribed by the terms of the financing or financial assistance. (B) Certify that the funds which would have been necessary to pay property taxes are used to maintain the affordability of, or reduce rents otherwise necessary for, the *123 units occupied by lower income households. As used in this subdivision, "lower income households" has the same meaning as the term "lower income households" as defined by Section 50079.5 of the Health and Safety Code.
Thus, under Californiasection 214(g), the property must be used exclusively for rental housing and related facilities. In addition, one of the following must apply: at least 20 percent of the tenants must meet certain low income requirements; the owner must be eligible for and receive income tax credits pursuant to section 42 of the Internal Revenue Code; or the property must be financed by tax-exempt mortgage revenue bonds or general obligation notes. The law further requires the owner to certify that there is a deed restriction, agreement or other legal document restricting the project's usage for the relevant *124 purpose and that the units available for lower income tenants will be continuously available to or occupied by such persons. The owner must also certify that the amount of the tax reduction received will be expended for the benefit of the tenants by either maintaining the affordability or reducing the amount of the rents. In addition to the above requirements, the property must be owned and operated by an entity falling within one of the categories of religious, hospital, scientific, or charitable funds, foundations or corporations, including limited partnerships in which the managing general partner is an eligible nonprofit corporation. The provision permitting certain limited partnerships to take advantage of the tax exemption serves as the basis for petitioner's plan. Petitioner apparently believes that it qualifies as an eligible nonprofit corporation under Californiasection 214(g). With this status, petitioner will locate limited partnerships which own real property which can qualify for the reduced property tax benefits of Californiasection 214(g), and will offer to become a general partner in the partnerships. By their doing so, petitioner believes the limited partnerships *125 will thereby become eligible to receive the Californiasection 214(g) property tax reduction. Petitioner intends to be compensated as a general partner based upon the amount of the putative property tax reduction. Petitioner will effect its plan by means of a joint management agreement (management agreement) entered into with each respective limited partnership. Under the form of the management agreement petitioner will purchase an interest in the limited partnership and assume the role of co-general partner. Petitioner intends to share the status of general partner with the limited partnership's nonexempt general partner. However, under the management agreement petitioner's authority as a co-general partner is narrowly circumscribed. In general, the management agreement denies petitioner authority to screen or select the tenants or conduct general maintenance. Moreover, petitioner has no on-site management authority. Petitioner is, however, required to perform an inventory and survey of the tenants and their needs to determine what services would be most beneficial to them. Petitioner is also required to maintain records sufficient to ensure that the limited partnership *126 continues to qualify for the property tax reduction and the general business credit under sections 42 and 38. In exchange for acting as co-general partner and performing these services, petitioner will receive from the partnership an amount equal to an agreed upon percentage of the property tax reduction. In response to an inquiry related to its request for exempt status, petitioner represented to the IRS that with the income it is to receive as its share of the property tax reduction petitioner intends to provide the low income individuals living within the property with a number of programs or activities. In its brief petitioner gives specific examples from the administrative record of the uses to which petitioner intends to put its cash receipts from the property tax savings, including: [teach] tenants life and job skills so that they might get better jobs, which life skills could include teaching of the English language, conducting job interview classes, or resume writing. (Stip, Exh. D-4, pg. 2). [Tutor] children in their regular school classes so that they may have a better chance to succeed in public school. (Id.). Provide subsidies for child care or transportation *127 to assist tenants in going to school or jobs and/or provide job referral services. (Id.). Address physical deterioration problems unique to underprivileged areas, including graffiti removal and security. (Id.). [Reduce rent] or [make] direct payment of utility bills during unusually high utility usage months. (Id.). Conduct surveys and otherwise evaluate the property to determine how the lives and general environment of the tenants can be improved. (Stip, Exh. G-7, pg. 4). Assist in monitoring the tenants to assure that they qualify as low income tenants. (Id.). Contract with existing counseling services to provide counseling services for tenants. (Id.).
Petitioner states on brief that it became aware of nonprofit entities such as the Bridge of San Francisco, California, and Local Initiatives Support Corp. which were operating in San Francisco, Los Angeles and other areas by becoming affiliated with for-profit limited partnerships and availing themselves of the property tax exemption of Californiasection 214(g). Having an interest in the revival of blighted areas and the assistance of the underprivileged, petitioner sought to satisfy *128 such goal by availing itself of the property tax exemption. Petitioner thus concedes that the limited partnerships themselves will be for-profit entities. Since petitioner has supplied no further information about the entities which purportedly inspired the concept under scrutiny here, the Court is unable to draw any conclusions as to the aptness of the analogies which petitioner attempts to draw. The administrative record describes two management agreements with which petitioner is already connected. The first involves Grant Square Properties (Grant Square), a California limited partnership. Grant Square was formed on March 10, 1988, on which date the partners were Towne Centre Investment, Inc., a California Corporation (Towne Centre), as general partner having an overall partnership interest of 20 percent, and Howard Harris and Jerry Harris, who each had a 40 percent interest, as limited partners. Towne Centre contributed $ 1,000 to the capital of the partnership and the Harrises contributed real property worth $ 330,000. The Harrises are also the only shareholders of Towne Centre. Howard Harris is the father of Jerry Harris. As of April 16, 1990, the date on which petitioner's *129 attorney, Jerry Harris, wrote Ms. M. J. Salins of the Internal Revenue Service furnishing her detailed information about petitioner, Grant Square consisted of the following partners: Towne Centre and petitioner as general partners and Jerry Harris, Howard Harris, David Harris, Richard Harris and J.M. Hepps as limited partners. J.M. Hepps is the grandfather of Jerry Harris, Howard Harris is Jerry's father and David and Richard Harris are Jerry's brothers. Petitioner's general partnership interest represented one percent of the entire partnership. As of the time this case was submitted, Jerry Harris was also petitioner's president and a member of the board of directors. Howard Harris was a member of petitioner's board. Petitioner acknowledges that the management agreement with Grant Square was not negotiated at arm's length. On brief, petitioner states that it entered into this management agreement as a test of its plan to utilize the California tax reduction. The basic financial structure of the Grant Square management agreement requires payment to Towne Centre of an amount equal to 40 percent of the first year's California tax savings. According to the administrative record, *130 this amount is due as consideration for the work Towne Centre is to perform in "arranging the transaction." The balance of the first year's tax savings is apparently to be retained by Grant Square. In each subsequent year, petitioner is to receive an amount equal to 50 percent of the tax savings. Petitioner is also entitled to an amount equal to 15 percent of each month's "tax reduction" payment to it as an administrative fee. Petitioner signed its second management agreement with Hidden Cove Associates (Hidden Cove), a California limited partnership. Under this management agreement petitioner is entitled to receive an amount equal to 10 percent of the first year's tax savings and 50 percent of each subsequent year's savings. As with Grant Square, petitioner is to receive an additional 15 percent of each payment to it as an administrative fee. Unlike Grant Square, no member of the Harris family has an interest in Hidden Cove. Section 4 of the Hidden Cove management agreement provides in part that all other amounts which would have been paid as real estate taxes are to be used exclusively for the purpose of reducing the rents or otherwise maintaining the affordability of the *131 residential units. Section 6.A. provides that one of petitioner's duties as a co-general partner is to monitor the residential units so as to comply with section 42 of the Internal Revenue Code. On brief petitioner states that Howard Harris has resigned as secretary and chief financial officer of petitioner. Jerry Harris has indicated that he has no intention of remaining as president of petitioner for a long period of time and is instead in such office "because, frankly, no one else wants it and no one is likely to want it until petitioners [sic] program passes muster by obtaining its tax exemption." Jerry Harris has offered to resign as president of petitioner "to allay any fears of respondent regarding impropriety." Petitioner also states that none of the nine directors of petitioner (other than Jerry Harris and Howard Harris) have any interest in petitioner, Grant Square, or any partner in Grant Square nor are any of such directors related by blood or marriage to Jerry or Howard. Moreover, petitioner has no plans to engage in any business transaction with any other members of petitioner's board of directors. Section 501(c)(3) provides that to qualify for tax exempt status *132 under section 501(a) an organization must satisfy a number of tests. The organization must be organized exclusively for exempt purposes. Respondent agrees that petitioner passes this organizational test. Under section 501(c)(3) an organization must also be operated exclusively for exempt purposes, and no part of the organization's net earnings may inure to the benefit of any shareholder or individual. (Additional tests, not involved here, restrict an organization from engaging in certain political or lobbying activities.) Since these requirements are stated in the conjunctive in section 501(c)(3), failure to meet any one of them negates a finding of exempt status. Christian Stewardship Assistance v. Commissioner, 70 T.C. 1037, 1040 (1978); Levy Family Tribe Foundation v. Commissioner, 69 T.C. 615, 618 (1978). For reasons stated below, we conclude that petitioner fails the operational and private inurement tests. Section 1.501(c)(3)-(1)(c), Income Tax Regs., provides that "An organization will be regarded as 'operated exclusively' for one or more exempt purposes only if it engages primarily in activities which accomplish *133 one or more of such exempt purposes specified in section 501(c)(3)." As phrased, and as discussed in our decisions, this test focuses on the purposes the organization promotes by means of its activities. Aid to Artisans, Inc. v. Commissioner, 71 T.C. 202, 210-211 (1978). Article II of petitioner's Articles of Incorporation provides in part that "The specific purpose of this corporation is to provide innovative and affordable housing to low income and handicapped persons, including providing housing for pre-release and post-release persons who are or have been incarcerated in prisons." As indicated above, petitioner represented to the IRS, in response to an inquiry, that petitioner intends to use its cash receipts to perform a number of services for low-income, handicapped or elderly tenants. Petitioner has not begun operations and does not plan to commence its activities prior to obtaining Federal tax exempt status. It is acknowledged that an organization may seek tax-exempt status prior to beginning operations. The organization must, however, describe proposed operations in sufficient detail to permit the conclusion that the organization will *134 meet the necessary requirements of the exemption. La Verdad v. Commissioner, 82 T.C. 215, 219 (1984); see also American Science Foundation v. Commissioner, T.C. Memo. 1986-556; cf. World Family Corp. v. Commissioner, 81 T.C. 958 (1983). We need not, however, dwell upon the charitable aspects of petitioner's activities, although we note in passing that petitioner has made no attempt to adopt any actual plan by which petitioner expects to use its hoped-for share of the property tax reductions to implement its stated objectives. See, e.g., El Paso del Aquila Elderly v. Commissioner, T.C. Memo. 1992-441. In any event the crucial issue in this case is whether the purpose of petitioner's non-exempt activities is substantial in nature. Manning Association v. Commissioner, 93 T.C. 596, 604 (1989). Section 501(c)(3) requires that the exempt organization be "organized and operated exclusively" for religious, charitable, etc., purposes. (Emphasis added.) As in Manning Association, supra at 603, *135 the heart of this case is the word "exclusively." Will petitioner be operated exclusively for its stated purposes? In Manning Association we explicated "exclusively" in the context of section 501(c)(3) in the following words: The word "exclusively" has not been literally construed to mean "solely" or "absolutely without exception," Church in Boston v. Commissioner, 71 T.C. 102, 107 (1978), and we have recognized that "a nonexempt purpose even perhaps somewhat beyond a de minimis level has been permitted without loss of exemption," Copyright Clearance Center v. Commissioner, 79 T.C. 793, 805 (1982). Nevertheless, there is a limit beyond which the statute may not be stretched. That limit was set forth by the Supreme Court in Better Business Bureau v. United States, 326 U.S. 279, 283 (1945), as follows: the presence of a single [nonexempt] * * * purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] * * * purposes. [93 T.C. at 603-604; fn. ref. omitted.]
A review of the record *136 convinces us that petitioner's proposed activities include at least a "single" non-exempt purpose "substantial in nature." Better Business Bureau v. United States, 326 U.S. 279, 283 (1945); see Manning Association v. Commissioner, supra at 605. The two limited partnerships with which petitioner has already agreed to associate itself as a co-general partner are admittedly for-profit entities, and the partnership interests, other than petitioner's interests, are non-exempt holdings. Among the non-exempt partners of Grant Square are members of the Harris family who are also the organizers and officers of petitioner, and even though the non-exempt partners of Hidden Cove are unrelated to petitioner, they nonetheless stand to benefit from petitioner's activities. It bears repeating that none of the limited partnerships with which petitioner plans to associate is intended to be nonprofit. Thus, significant Federal income tax benefits will flow to the non-exempt partners, including depreciation deductions and sections 38 and 42 general business credits. In addition, the California property tax reductions, even though they *137 are to be used exclusively for the purpose of reducing the rents or otherwise maintaining the affordability of the residential units, inure indirectly at least to the benefit of the non-exempt partners in that the partnerships are thereby relieved of the necessity of maintaining rents at a level sufficient to cover operating expenses which would otherwise have to be paid out of partnership capital. As we understand petitioner's plan, its role is central to the obtaining of the benefits we have described. The keystone of petitioner's entire plan is of course to lend its exempt status to achieving the objective of property tax reduction. Petitioner is to receive its share of the property tax savings out of partnership cash flow, but the balance of the cash flow remains with the for-profit partnerships. As stated, in addition to petitioner's continued responsibility for assuring the availability of the property tax reduction, petitioner must also see to it that each partnership "complies" with the requirement of section 42. This is made clear by the statement in petitioner's brief that "The only other activity [in addition to the described application of tax savings] petitioner *138 agrees to undertake with respect to its 'management' and partnership agreements is to ensure the property owned by the partnership complies with the requirements of both section 42 and R&T Code section 214(g)." Under sections 42 (entitled "Low-Income Housing Credit") and 38 (entitled "General Business Credit"), a nonrefundable income tax credit could be claimed by the owner of a newly constructed or substantially rehabilitated qualified low-income housing project placed in service after 1986 and generally before July 1, 1992. Sections 42(a) and (o)(1); see section 38 and specifically section 38(b)(5). According to a Congressional Joint Committee on Taxation "Bluebook", the credit was enacted in 1986 with the hope that it would be an "efficient mechanism for encouraging the production of low-income rental housing * * *." Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986 at 152 (J. Comm. Print 1987); see also 1 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 27.5, at 27-37 (2d ed. 1989). Given the combined thrust of section 42 and Californiasection 214(g), which if available will significantly benefit the non-exempt partners, *139 it is difficult to see how petitioner can avoid the taint of nonexclusive operation for charitable purposes. The very purpose of section 42, compliance with which it is petitioner's duty to ensure, is to provide tax incentives to business entities. It is self-evident that section 501(c)(3) organizations do not need business tax credits. And as said before we are able to perceive nothing in the California statute which would restrict ownership of limited partnership interests to nonprofit entities. In est of Hawaii v. Commissioner, 71 T.C. 1067 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981), we held that a taxpayer's activities, although educational in nature, served the commercial purposes of for-profit corporations. Petitioner's activities here serve the commercial purposes of the for-profit partners in the limited partnerships of which petitioner is a general partner. To be sure, petitioner assures us that the partnerships intend to apply the property tax savings to further the low income housing purpose, but since the property is owned by the for-profit partnerships, it is the property owners *140 who are ultimately benefited. Respondent's final adverse ruling as to petitioner's exempt status gave as an additional reason for the denial of exempt status the belief that petitioner's net earnings inure to the benefit of a private shareholder or individual. Members of the Harris family are, in addition to being among petitioner's sponsors, shareholders of Towne Centre, a general partner of Grant Square, and also are limited partners of Towne Square. While they are apparently not limited partners of Hidden Cove, that entity is nevertheless admittedly also a for-profit limited partnership. In American Campaign Academy v. Commissioner, 92 T.C. 1053, 1069 (1989), we held that an organization's conferral of private benefits even on "disinterested" persons may cause it to serve a private interest within the meaning of section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.
The facts of this case demonstrate how inextricably interwoven a commercial purpose under the operational test and the serving of a private interest under the private inurement test may become. Consequently we need not independently consider the application of the private inurement test *141 to the facts of this case. Based on the foregoing we hold that petitioner has a non-exempt purpose which is substantial, and that private interests will be served by its activities. Accordingly, Decision will be entered for respondent. Footnotes
1. Cal. Rev. & Tax. Code sec. 214(g)↩ (West 1987), was amended by 1992 Cal. Stat. ch. 1180, sec. 4.5. The amendments do not materially affect the provisions relied upon by petitioner.